IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PEGGY SUE BALDWIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14-cv-442-CVE-TLW |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff, Peggy Sue Baldwin, seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity ("SGA") by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his or her alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A

physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if

2

supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001).

## BACKGROUND

Plaintiff, then a 47-year old female, filed for Title II and Title XVI benefits on May 10, 2011, with a protective filing date of April 14, 2011, alleging a disability onset date of October 1, 2009. (R. 209-217). Plaintiff claimed that she was unable to work due to plantar fasciitis, attention deficit hyperactivity disorder ("ADHD"), depression, a back injury, headaches, and carpal tunnel syndrome. (R. 169, 177, 251). Plaintiff's claims for benefits were denied initially on September 14, 2011, and on reconsideration on December 28, 2011. (R. 167-171, 174-179). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on November 29, 2012. (R. 76-114). The ALJ issued a decision on December 18, 2012, denying benefits. (R. 60-71). The Appeals Council denied review, and plaintiff appealed. (R. 1-4; dkt. 2).

### The ALJ's Decision

Citing plaintiff's earning records, the ALJ found that plaintiff worked after the alleged disability onset date but that the work activity did not rise to the level of substantial gainful activity.[1] (R. 62). He found, therefore, that plaintiff had not engaged in substantial gainful activity since "April 1, 2011, the amended alleged onset." Id. The ALJ found that plaintiff had severe impairments of "Degenerative Disc Disease, Carpal Tunnel Syndrome, plantar fasciitis, peripheral neuropathy, hypertension, Attention Deficit Hyperactivity Disorder, and major

---

[1] "Substantial gainful activity" means the performance of a substantial service with a reasonable regularity. Markham v. Califano, 601 F.2d 533, 534 (10th Cir. 1979). It is work activity that is both substantial and gainful. Substantial work activity "involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a)(1997), 416.972(a) (2010). Work is "gainful" if "it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §§ 404.1572(b) (1997), 416.972(b) (2010).

3

depressive disorder." (R. 63). The ALJ determined that plaintiff's impairments did not meet or medically equal a listing. (R. 63-64). The ALJ also evaluated the severity of plaintiff's mental impairments using the "paragraph B" criteria,[2] and found that plaintiff had mild limitations in her activities of daily living, moderate limitations in the area of social functioning, and mild difficulties in concentration, persistence, and pace. (R. 63). He found that plaintiff had experienced no episodes of decompensation of extended duration. (R. 64).

The ALJ assessed the following residual functional capacity ("RFC"):

> Claimant can do less than the Full Range of light work with no more than the occasional lifting up to 20 pounds, no more than the frequent lifting or carrying up to 10 pounds; standing/walking 6 hours out of an 8-hour workday; sitting 6 hours out of an 8-hour workday; no more than frequent handling, fingering, or feeling but able to understand, remember, and carry out simple and some complex instructions and able to relate and interact with coworkers and supervisors on a work-related basis only with occasional interaction with the general public. The claimant can adapt to a work situation with these limitations/restrictions and her medications would not preclude her from remaining reasonably alert to perform required functions presented in a work setting.

Id.

The ALJ reviewed plaintiff's testimony, the statements of plaintiff's sisters regarding plaintiff's daily activities, and all the medical evidence in the record. (R. 65-68). In assessing plaintiff's credibility, the ALJ noted multiple inconsistencies between plaintiff's statements of disabling symptoms and the medical evidence. (R. 68-69). He also noted conflicts in plaintiff's hearing testimony and her failure to reveal her brother's living arrangements when questioned

---

[2] Evaluation on the basis of mental disorders requires consideration of functional limitations described in paragraphs B and C of the adult mental listings (except 12.05 and 12.09) after the presence of a particular mental disorder is substantiated under paragraph A. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). To be deemed disabling, at least two of the following specified limitations must be established: 1) marked restriction of activities of daily living; or 2) marked deficiencies in maintaining social functioning; or 3) marked deficiencies in maintaining concentration, persistence or pace; or 4) repeated episodes of decompensation, each of extended duration. id., §§ 12.01, et seq.

about with whom she lived. (R. 69). The ALJ specifically noted that plaintiff had not told the psychiatric consultative examiner that she was "working taking care of her mother and brother," which the ALJ said "skews the examination results." Id. Based on those findings, the ALJ concluded that plaintiff's testimony was "suspect" and that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. Id.

The ALJ found that plaintiff could perform her past work as a dry clean spotter I. Id. He further determined that there are other jobs existing in the national economy that plaintiff could perform. (R. 70-71). Based upon testimony from a vocational expert, the ALJ found that plaintiff could work as a Housekeeping Cleaner (DOT # 323.687-014), Routing Clerk (DOT # 222.687-022), Tube Operator (DOT # 239.687-014), or Addresser (DOT # 209.587-010). Id. Accordingly, the ALJ found plaintiff is not disabled. Id.

On appeal, plaintiff raises two points of error. (Dkt. 16). First, plaintiff contends the ALJ erroneously evaluated her claim based on an incorrect alleged onset date.[3] (Dkt. 16 at 3-5). Second, plaintiff challenges the ALJ's credibility determination. Id. at 5-7.

## ANALYSIS

Plaintiff amended her alleged disability onset date at the hearing first to April 1, 2011, then to January 1, 2012. (R. 80-81). She faults the ALJ for not acknowledging the second amended onset date in his written decision. (Dkt. 16 at 3). She contends this error "cannot be excused as a harmless clerical oversight because the ALJ relied heavily on activities and events that occurred before the correct alleged onset date in discrediting [plaintiff's] subjective complaints." Id. at 4. Plaintiff alleges that the ALJ's failure to cite January 1, 2012, as her onset date is an indication that he misunderstood the facts of the claim and that his "entire decision is

---

[3] The "onset date" is the first day an individual is disabled as defined in the Social Security Act and the regulations. SSR 83-20, 1983 WL 31249, at *1.

undercut by his fundamental misunderstanding of the time period at issue." (Dkt. 16 at 4-5). The Commissioner admits that the ALJ's decision did not accurately reflect plaintiff's amended onset date. (Dkt. 19 at 7-8). However, the Commissioner asserts that, even had the ALJ noted the amended date, his "citation of record inconsistencies would remain supported and Plaintiff's arguments to the contrary are unpersuasive." Id. at 8.

At the outset, the undersigned notes that the ALJ never found plaintiff to be disabled. Therefore, the onset date is irrelevant for purposes of this review. Gutierrez v. Astrue, 253 F. App'x 725, 729 (10th Cir. 2007) (unpublished) (holding that the need to determine an onset date is relevant only where a claimant has been found disabled). See Hill v. Astrue, 289 F. App'x 289, 294 (10th Cir. 2008) (unpublished) (expert testimony not required where ALJ never made a finding that claimant eventually became disabled and claimant failed to show from evidence that there was an ambiguous onset date which required clarification); Godinez v. Astrue, 2010 WL 3829458 *5 (D. Kan.) (unpublished) ("The ALJ did not find disability, and there was simply no basis or necessity to establish an onset date or to apply SSR 83-20.").[4]

Nonetheless, in this case, plaintiff's complaint of error regarding the ALJ's failure to cite the "correct" onset date is closely intertwined with her allegations of error regarding the ALJ's credibility determination. Therefore, the undersigned will review the facts surrounding the "onset date" in conjunction with discussion of the pertinent medical evidence in the record and the ALJ's credibility evaluation based upon that evidence.

When plaintiff filed her applications for benefits, she alleged an onset date of October 1, 2009. (R. 209-217). The information and supporting documentation submitted by plaintiff with her applications alleged an onset date of October 1, 2009. (R. 209, 211, 233). When plaintiff was

---

[4] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

contacted by the agency on May 10, 2011, regarding her work status, she admitted that she started working as a home health aide in 2008 and that she was presently working. (R. 239).[5] Plaintiff was asked: "Do (Did) you get special help on-the-job or extra pay in any of the jobs that you told us about in item 3?" Plaintiff answered: "No." (R. 240).

The agency representative reported the following discussion:

> Claimant is currently employed with the Oklahoma Department of Human Services as a home health aide to her mother. Her current pay rate $10.50 an hr/22.05 hrs a week [and] paid biweekly. The total monthly income received is $926.10 in a four week month. In the month of April 2011, there was [sic] three pay periods. On average earnings are not SGA. I am recommending a POD of 04/01/2011.

(R. 246).

On the DDS Disability Worksheet dated June 4, 2012, plaintiff reported she was presently working. (R. 251). She answered: "Yes" to the question: "Has your condition(s) caused you to make changes in your work activity? (for example: job duties or hours)." Id. She reported that she made those changes on March 10, 2011. Id. No description of those changes in work activity appears on the form. She answered: "No" to the Question: "Since your condition(s) first bothered you, have you had gross earnings greater than $1000 in any month?" Id. In the job history section of the form, plaintiff reported past work as a "Care Provider, Home health aid from 2004, 2006, 2007 to Present;" and as a "Spotters, Dry Cleaning," from "2004 and off and on to 2007." Id.

On June 27, 2001, plaintiff reported to the agency that her "mother & brother are roommates in my house." (R. 261). She claimed her daily activities consisted of "get up, drink coffee, take meds, eat breakfast. If I can without pain I take a shower & get dressed. Watch TV,

---

[5] The administrative record contains a form with boxes to check and lines to fill in that was apparently mailed to plaintiff to fill out and send back. (236-245). The form appears to have been filled out electronically and is not signed but has an "attestation" in the signature block. (R. 243).

7

talk on phone, play on computer." (R. 262). She answered "No" to the question: "Do you take care of anyone else such as a wife/husband, children, grandchildren, parents, friend, other?" Id. She wrote that she fed and watered two dogs. Id. On the question: "Does anyone help you care for other people or animals?" she responded: "2 sisters & best friend care for mother & brother & dogs when needed." Id.

At the hearing on November 29, 2012, plaintiff's attorney called attention to plaintiff's work after her alleged 2009 onset date but noted that "some DDS people looked at the work and I believe … determined that it was not considered substantial gainful activity." (R. 79). He said: "It's actually been taking care of her mother" and said that plaintiff has had help with that work from family members. Id. The ALJ noted that the agency comment to which the attorney was referring was written in May 2011. (R. 80). Plaintiff's attorney then said: "I have talked to my client, Your Honor. As far as a disability, a disability onset date, I think it is recommended 4/1 of '11." Id.

The ALJ then inquired about plaintiff's reported earnings from the third and fourth quarters of 2011, and asked whether there was support for plaintiff's assertion that she had help with her mother, and whether her sister was paid for that help. (R. 80-81). The following discussion then took place:

> CLMT: Your Honor, she doesn't get paid for the help. She helps me in order for me to be able to buy my medications I need and help with our mother. Our mother is my roommate.
>
> ALJ: Fine. We'll get into that, ma'am. So are you, have we discussed the amended elected onset date to --
>
> ATTY: Actually, Your Honor, I have and I mean, what I've discussed with my client is 1/1 of '12.
>
> CLMT: Uh-huh, yes.

8

>ALJ: And, what is special is that? Have we stopped the work?
>
>ATTY: The work stopped September --
>
>CLMT: 30th.
>
>ATTY: -- 30th, Your Honor. All, all work stopped September 30th.
>
>ALJ: September 30th of this year?
>
>ATTY: Yes, Your Honor.

(R. 81).

In the step-by-step findings of the ALJ's written decision, the onset date is identified as April 1, 2011. (R. 62). The ALJ noted that plaintiff is employed as a home health aide to her mother and that her earnings record revealed that plaintiff earned over the SGA amount of $1,000 per month for the fourth quarter of 2010, the first quarter of 2011, the third quarter of 2011 and the fourth quarter of 2011 and that she earned close to the SGA amounts in additional quarters. Id. He said:

>Claimant testified, and her sister would have testified similarly, that the claimant had a lot of family help caring for her mother. The undersigned will continue with the sequential disability evaluation process to determine whether claimant was medically disabled, and thus entitled to the disability payments that she has requested. However, it really should be noted that although the claimant's work activity as a home health provider for the past 16 years and continuing to the present fell just short of the substantial gainful activity income level, it certainly is quite probative of much more functional ability than she is alleging, even if she was receiving some help from siblings.

(R. 62-63).

Plaintiff is correct in stating that she is allowed to change her statement as to when her disability began by testimony at a hearing. SSR 83-20, 1983 WL 31249 *1.[6] However, as provided by the ruling, her allegation must be consistent with the medical evidence in the record.

---

[6] Social Security Rulings do not hoave the force of law but must be given some deference as long as they are consistent with the Social Security Act and regulations.

> The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. Those factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.

Id. at *1.

As quoted above, the ALJ stated that plaintiff's "work activity as a home health provider for the past 16 years and continuing to the present … is certainly quite probative of much more functional ability than she is alleging, even if she was receiving some help from siblings." (R. 63). Plaintiff contends that this statement shows that the ALJ found her work activity to be a significant credibility factor. (R. 63, dkt. 16 at 4). The Commissioner notes that plaintiff's continuing work for nine months even after her amended alleged onset date may evidence greater functional abilities than she alleged. (Dkt. 19 at 8).

The ALJ was entitled to consider plaintiff's work activity, even activity that did not qualify as substantial gainful activity, before and after her alleged onset date as a factor to weigh in determining whether plaintiff is disabled. See 20 C.F.R. §§ 404.1571, 416.971:

> The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level.
> 
> \* \* \*
> 
> Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did. We will consider all of the medical and vocational evidence in your file to decide whether or not you have the ability to engage in substantial gainful activity.

Although these regulations are applied at step one of the sequential evaluation, they are applicable here because there are conflicts and inconsistencies between statements plaintiff made to the agency in her applications for disability benefits, to her doctors, to the consultative examiner, and to the ALJ regarding her work activities.

"Factors relevant to determining an onset date include the claimant's allegations of an onset date and the claimant's work history, but '[t]he medical evidence serves as the primary element in the onset determination.'" Wiederholt v. Barnhart, 121 F. App'x 833, 837 (10th Cir. 2005) (unpublished) (citing SSR 83-20, at *2). At the time of his decision, the only evidence available to the ALJ for adopting the January 1, 2012, onset date was plaintiff's testimony that she stopped caring for her mother on September 30, 2012, just one month before the hearing. (R. 81).[7] Moreover, as the Commissioner asserts in her response brief, even had the ALJ used the January 1, 2012, date as the onset date, he found her allegations of disability were not credible. The issue before the Court, then, is whether, in light of the whole record, the ALJ's credibility determination is supported by substantial evidence. In this regard, the ALJ found plaintiff's testimony was "suspect" in several respects and he set forth his reasoning for that finding. (R. 65-69). The undersigned concludes that the record reveals ample support for the ALJ's conclusion that plaintiff's testimony and statements of disability were not credible.

Plaintiff testified that she had help from her family in taking care of her mother for sixteen years even while she was receiving wages from the Department of Human Services for her care. (R. 87-88). She testified that she did "nothing" for her brother. (R. 107).

Plaintiff's medical treatment records from January 2010 through August 2010 contain multiple references to complaints of stress associated with taking care of her disabled brother and her mother, who has dementia or Alzheimer's. (R. 320, 323, 335, 401). None of those records reflect that her sisters, or anyone else, were helping. There is a single notation, on November 15, 2010, where plaintiff told a physician that she "cares for her mother and MR brother (mental age

---

[7] Plaintiff now claims that her earnings dropped around the time of the "correct alleged onset date and all work stopped later that same year."(Dkt. 16 at 5). The earnings statement for that time period was not available to the ALJ at the time of his decision.

11

9 yrs.) She has help in the home for 9 hrs. per day." (R. 314).[8] On August 11, 2011, plaintiff sought treatment at the Bailey Medical Center Emergency Room for a "pulled" back from helping bathe her disabled relative. (R. 426-437).

In the South Pointe Pain Management treatment records after January 1, 2012, the date that plaintiff now claims she became disabled, plaintiff complained that she could not keep help for her brother, that she had two acres to mow and "too much to do all the time." (R. 490). On May 30, 2012, plaintiff claimed her brother and her mother were getting hard to care for and said she was "lookin [sic] for help may have to put Bro in a home to care for just mom." (R. 488). In June 2012, plaintiff complained that her mother had been in and out of the Bailey Medical Center in Owasso and that she had two acres to mow, weedeat and "my mom & Bro to care for the best I can." (R. 486). She added: "Now time to get more help in the home." Id. On July 23, 2012, plaintiff said her "meds are doing good" for her though she complained that her hands were very bad, that she had a fall on the stairs, and "now my back is giving me a bad time." (R. 484). At no time did plaintiff mention that her sisters were performing any of her mother's care.

The treatment records from plaintiff's counselor on March 23, 2012, indicate that plaintiff reported she had done well overall, that she had functioned well at home and planned to convert her garage and start her own "wash and dry and iron" business "for extra income." (R. 478). On June 21, 2012, plaintiff reported that the medications were helping, that she tolerated the medications well with no adverse side effects, that she functioned well at home, and that she has been able to care for her disabled mother and brother. (R. 482). There was no indication in those records that her sisters or an aide were helping her take care of her mother and brother.

---

[8] Plaintiff testified that her brother has an aide and that she does nothing for her brother. (R. 106-107). The remark does not specify whether this "help" is an aide or a family member.

The ALJ noted the inconsistencies between plaintiff's testimony and the medical evidence in the record. (R. 67-68). In particular, the ALJ noted that plaintiff appeared for an examination by Brian R. Snider, Ph.D., an agency consultant, on August 4, 2011, and told him that she last worked about a year and a half ago at Mack's Cleaners in Tulsa for about four months, and that she only gave her work history at various dry cleaning facilities before that time. (R. 68, 421-424). Dr. Snider said: "There have been no reported attempts at working since her last job." (R. 422). Plaintiff described her daily activities to Dr. Snider as follows:

> In a normal day, Ms. Baldwin states that she gets up, takes a shower, gets dressed, eats, takes her medications, and watches movies. She states that she attempts to complete chores but it is difficult due to depression and pain in her feet and back. She states that her sister does her grocery shopping for because of the pain in her feet. [sic] She states that she usually prepares only simple meals due to pain in her feet. She reports that she drives but she has some difficulty with this task due to pain in her back and feet. She admits that she occasionally neglects her self-care because of depression and pain.

Id. Plaintiff did not mention to Dr. Snider that she was caring, or even helping with care, for her mother and brother.

At the hearing, the ALJ asked plaintiff why she told the consultative examiner that she had not worked for a year and a half since Max Cleaners. (R. 88). Plaintiff responded that she did not consider taking care of her mother as working, that she did not think about the paycheck and told him that her "two sisters do it." Id. The ALJ asked plaintiff, "Why weren't you, why weren't you truthful with this individual?" She answered that she didn't see it as working. Id. The ALJ asked: "You didn't [think] that might affect his opinion?" Id. She said: "No, I didn't. I didn't think about it at all. Honestly, me working is me being a dry cleaner and an all around presser like I've been all my life. Helping my mother with a plate or tucking in her bed, to me is not working. That's just my mother." (R. 88-89). The ALJ asked plaintiff if she had told her doctor and she said: "I never claimed this. I mean I just didn't even look at it as a job honestly. I got

checks that were automatically deposited into my account and I use them for what my mother and I need in our home, you know." (R. 89). Plaintiff's testimony directly conflicts with her statements of past work history to the agency in her application papers, with her complaints to her doctors about having to care for her mother and brother, mowing two acres and "having too much to do all the time."

The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 2012).

The ALJ reviewed all the medical evidence in the record, including reports from the time period after January 1, 2012. (R. 66-69). He summarized the treatment records from South Pointe Pain Management showing that plaintiff was treated with medication for left heel pain, bilateral carpal tunnel and chronic low back pain. (R. 66). Those records, as the ALJ noted in his decision, reveal that plaintiff's pain was improved, that the medication was working well for her until she fell on July 23, 2012, and that in August 2012, she reported she was "doing good." (R. 483-491). The ALJ also included in his summary of the evidence the medical records from plaintiff's counselor after January 1, 2012. (R. 67). As the ALJ noted, plaintiff reported her medications were still helping, that she was doing well overall and that she planned to convert her garage and start her own wash, dry, and iron business for extra income. (R. 478-491). In August 2012, she reported she was "doing good" though she had had a difficult month with increased anxiety after the death of her sister. (R. 483). Her medications were not changed. Id.

Additionally, the ALJ reviewed the consulting physicians' opinions and explained the weight he accorded them and his reasons for providing some additional limitations in his RFC assessment, which were favorable to plaintiff. (R. 68).

Credibility determinations by the trier of fact are given great deference. Hamilton v. Secretary of Health & Human Services, 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

White, 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. See Kepler, 68 F.3d at 391; SSR 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1172 (10th Cir. 2012).

Given the evidence undermining plaintiff's claim of disabling symptoms as of January through August 2012, the undersigned recommends that the District Court find that the ALJ's failure to cite January 1, 2012 as the onset date is not reversible error in light of his conclusion that plaintiff is not disabled. The undersigned finds that the ALJ's credibility decision was grounded in the evidence and sufficiently specific to make clear to the individual and to any subsequent reviewers the weight he gave to plaintiff's statements and the reasons for that weight. For this reason, the undersigned recommends that the ALJ's credibility determination be affirmed.

## RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS that the Commissioner's decision in this case be **AFFIRMED.**

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by November 18, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 4th day of November, 2015.

_____
T. Lane Wilson
United States Magistrate Judge